**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DANIEL ADAMS, JR.,** | : | **Civil No. 1:22-CV-1293** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI**, | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

## I.   Introduction

This Social Security appeal calls upon us to consider the relationship between disability and drug dependence. In undertaking this task, we are guided by a clear legislative mandate from Congress. In 1996, Congress amended the Social Security Act to speak directly to the issue of drug dependence as a contributing factor in disability claims, stating that: "An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423 (d)(2)(C). Consistent with this statutory guidance, the Commissioner has adopted an analytical paradigm in these cases which focuses upon the "key factor" in making disability determinations for

1

drug addicts; namely, "whether [one] would still find you disabled if you stopped using drugs or alcohol." 20 C.F.R. § 404.1535(b)(1).

We are now called upon to determine whether an Administrative Law Judge (ALJ) correctly applied this analytical model to Daniel Adams' case. Adams was a youth, who had not yet attained the age of twenty when he alleged that he had become disabled. The medical record before the ALJ was extensive and revealed a closely intertwined series of emotional and physical impairments, as well as a longstanding history of polysubstance drug abuse, but shed little clear light on the question of whether Adams would be disabled if he ceased his drug abuse. The reason why the record was murky on this point is quite simple: there are few instances in which Adams was not actively abusing controlled substances. However, this record, while equivocal, contained substantial evidence which supported the ALJ's finding that that Adams' addiction was a material contributing factor in his disability.

Therefore, in assessing this appeal we are reminded of the familiar proposition that we exercise a limited scope of substantive review when considering Social Security appeals. As the Supreme Court has noted:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-

evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

In Adams' case, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.   <u>Statement of Facts and of the Case</u>

On September 4, 2019, Daniel Adams applied for child's insurance and supplemental security income benefits, alleging an onset of disability on January 1, 2013. (Tr. 144). Adams was born in April 1993, and was 19 years old at the time of the alleged onset of his disability. (Tr. 146). At the time of the alleged onset of disability, Adams had never held a job, but had reported living on a farm and taking

care of animals. (Tr. 992, 1011, 2523, 2715). Adams asserted that he was disabled due to the combined effects of the following severe conditions: neuropathy of the left arm, neuropathy of the right arm, depression, anxiety, schizophrenia, attention deficit hyperactivity disorder (ADHD), and polysubstance abuse. (Tr. 147). Thus, the issue of Adams' drug abuse and its relationship to his other physical and emotional impairments, lies at the heart of this case.

A.    **Adams' History of Drug Use and Impairment.**

With respect to the question of the relationship between Adams' drug use and his claimed disability, the medical record, while extensive and somewhat equivocal, (Tr. 398-2731), contains substantial evidence which indicates that Adams' drug addiction was a contributing factor material to this determination of disability because he would not be disabled if he stopped his illicit substance use.  On this score, the ALJ's assessment of this issue was complicated by the profound persistence of polysubstance drug abuse on Adams' part. Simply put, Adams' medical profile provided only limited evidence of instances of sobriety during which the severity of his impairments could be assessed without the distorting prism of his drug abuse.

The ways in which Adams' addiction was inextricably intertwined with his physical and emotional impairments was starkly illustrated by a December 3, 2013,

report from James Klebe, Adams' treating psychologist. (Tr. 1010). In this report Dr. Klebe drew a direct connection between Adams' addiction and his other impairments, noting that he had discontinued his efforts aimed at treating Adams' emotional conditions after the plaintiff had declined his repeated entreaties to engage in intensive out-patient therapy for his polysubstance drug addiction. (Id.) Dr. Klebe attributed the severity of many of Adams' impairments to his persistent drug use, explaining that Adams used drugs in an ill-conceived effort to self-medicate for his emotional impairments, and suffered some physical limitations due to an accidental overdose of drugs. (Id.)

The clinical record further confirmed Adams' active, aggressive drug use around the time of the alleged onset of his disability. Thus, Adams was hospitalized twice for polysubstance abuse and dependence; first in March 2012 (Tr. 420), and later in April 2012. (Tr. 506, 875). During the ensuing months and years, Adams repeatedly received intensive and in-patient treatment for drug addiction and related mental health conditions.[1] Moreover, in many instances these treatment records

---

[1] See Tr. 403-425, in-patient records dated March 18-23, 2012, Schuylkill Medical Center; Tr. 470-707, in-patient records dated April 21-26, 2012, Geisinger Medical Center; Tr. 1394-1481, treatment records dated April 21-26, 2012 Geisinger Health System; Tr. 1963-69 and 1973-81, treatment records dated June through August 2020, , the Meadows Psychiatric Center; Tr. 2134-2190 treatment records dated August 2020, Belmont Behavioral Hospital; Tr. 2192-2210 treatment records dated September 2020, Friends Hospital; Tr. 2211-2458, treatment records dated October

suggested a direct correlation between Adams' polysubstance drug abuse and the severity of his mental health symptoms.

For example, in April of 2012, Adams "was found unresponsive in a friend's home after being down for an estimated 27 hours secondary to an unintentional multi-drug overdose." (Tr. 1906). Later, in June of 2020, Adams was voicing delusional thoughts at a time when his self-reported drug use and drug tests indicated that he was abusing both marijuana and methamphetamine. (Tr. 1974-80). Likewise, in August 2020, Adams was treated for drug addiction and depression following an overdose on prescription medications. (Tr. 1998). At that time, Adams self-reported behavior which seemed to link his depression to his addiction stating, "I just wanted to get high and I got bored," and reporting that "I would not mind if I died." (Id.)

Adams experienced a period of enforced sobriety between 2017 and July of 2019 when he was incarcerated following his conviction for stealing his maternal grandmother's credit card. (Tr. 1920). Following his release from custody, Adams initially denied mental health difficulties while engaging in drug seeking behaviors. Thus, in an August 21, 2019, new patient encounter with caregivers, Adams denied experiencing anxiety, depression, agitation, or mood changes but actively sought a

---

2020, Lehigh Valley Hospital;   Tr. 2666-2731, treatment records dated March through May 2021, Lehigh Valley Schuylkill East.

referral for medical marijuana. (Tr. 1894). During a psychiatric evaluation conducted on August 27, 2019, Adams was alert and oriented to person, place, and time; his memory and attention were both intact; he was cooperative; his speech was soft and fluent; he maintained good eye contact and showed no motor disturbances. While Adams' mood was depressed, his thought process was goal-directed and free of delusions of paranoia and grandeur. During this evaluation, Adams denied bizarre auditory or visual hallucinations and disclaimed any suicidal or homicidal thoughts. (Tr. 1921). Thus, the clinical record in the immediate aftermath of his incarceration suggested that Adams' forced sobriety had significantly mitigated the severity of his mental health symptoms.

A number of medical sources opined regarding the extent to which Adams was disabled due to his impairments and degree to which his drug use contributed to those impairments. Several of these medical sources found that Adams retained the capacity to do some work, notwithstanding his impairments, particularly if he abstained from drug use. For example, two state agency psychological consultants, Drs. Fink and Chiampi, both concluded that Adams could perform simple, routine tasks, and suffered from no more than a moderate degree of impairment. (Tr. 66-93, 113-138). Likewise, a consultative examination of Adams by Dr. Amanda Kochan-

Dewey in November of 2020, found that the plaintiff did not exhibit significant mental or emotional impairments. (Tr. 2488-94).

Other, earlier evaluations conducted during a time when Adams was actively in the throes of polysubstance drug abuse were more guarded. Moreover, some of these earlier medical opinions directly linked the severity of Adams' impairments to his active drug use. For example, a December 3, 2013, report from James Klebe, Adams' treating psychologist, found that Adams "would not be fit for sustained, gainful, employment," but drew a direct connection between Adams' addiction and his other impairments, noting that Klebe had discontinued his efforts at treating Adams' emotional conditions after the plaintiff had declined his repeated entreaties to engage in intensive out-patient therapy for his polysubstance drug addiction. (Tr. 1010). Thus, Dr. Klebe attributed the severity of many of Adams' impairments to his persistent drug use, explaining that Adams used drugs in an ill-conceived effort to self-medicate for his emotional impairments, and suffered some physical limitations due to an accidental overdose of drugs. (Id.)

Similarly, a June 13, 2013, consultative examination of Adams by Dr. David O'Connell reached equivocal, mixed and somewhat contradictory conclusions regarding the severity of his impairments. Thus, Dr. O'Connell assigned Adams a Global Assessment of Functioning, or GAF, score of 35, a score which was

8

emblematic of severe impairment. (Tr. 962). However, throughout his report Dr. O'Connell found that Adams, for the most part, experienced no more than mild impairments in mental functioning. (Tr. 953-64).

### B.   **Administrative Proceedings**

It is against this medical backdrop that the ALJ held a hearing on Adams' claim on June 21, 2021. (Tr. 12-45). At the hearing, both Adams and a Vocational Expert testified. (Id.) Following that hearing on August 25, 2021, the ALJ denied Adams' application for benefits. (Tr. 141-57).

In that decision, the ALJ first concluded that Adams was under the age of 22 as of the alleged date of the onset of his disability in January of 2013, and had not engaged in substantial gainful activity since January of 2013. (Tr. 146-47).  At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Adams had the following severe impairments: neuropathy of the left arm, neuropathy of the right arm, depression, anxiety, schizophrenia, and attention deficit hyperactivity disorder (ADHD), and polysubstance abuse. (Tr. 147). At Step 3, the ALJ determined that including Adams' substance use, the severity of his impairments met the listing criteria of section 12.03 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d), 416.925). (Id.)

Under the Commissioner's regulations relating to drug abuse, this finding then required the ALJ to decide whether Adams would be disabled if he refrained from drug use. On this score, the ALJ concluded that Adams would not be disabled if he abstained from drug use. (Tr. 148-51). Instead, the ALJ fashioned a residual functional capacity ("RFC") for the plaintiff which considered Adams' impairments in the absence of drug use, and found that:

> After careful consideration of the entire record, the undersigned finds that, if the claimant stopped the substance use, the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he must avoid unprotected heights. He could occasionally climb ladders and scaffolds and could frequently climb ramps and stairs. He could occasionally use his bilateral upper extremities for overhead reaching, and occasional use of right hand for handling and fingering. He could tolerate occasional exposure to vibration. He is able to understand, retain and carry out simple instructions with few work place changes. He could engage in occasional decision-making with respect to work related activities. He should avoid interaction with the public, except for incidental contact. He could tolerate occasional interaction with co-workers, but he must avoid group, team or tandem work activity.

(Tr. 151).

Specifically, in making the RFC determination, the ALJ considered the medical evidence, medical opinions, and Adams' testimony regarding his impairments. On this score, the ALJ found the medical opinions of those sources who determined that Adams could do some work had greater persuasive power than the more extreme medical opinions of record. (Tr. 153-55). In this regard, the ALJ's

10

decision canvassed and assessed numerous medical opinions evaluating Adams'
physical and mental limitations, but the medical opinion analysis had one omission.
The ALJ did not specifically address Dr. Klebe's December 2013 opinion which
found that Adams "would not be fit for sustained, gainful, employment," but made
a clear correlation between Adams' addiction and his other impairments, noting that
Klebe had discontinued his efforts at treating Adams' emotional conditions after the
plaintiff had declined his repeated entreaties to engage in intensive out-patient
therapy for his polysubstance drug addiction. (Tr. 1010).

        The ALJ also found that Adams' clinical history and his self-reported
activities of daily living supported a finding that he could perform some work if he
refrained from drug use, noting that:

> In the absence of substance abuse, the records reflect that his mental
> status examination findings note he was depressed and OK, his
> behavior was normal, thought content was normal, insight/judgment
> improved and normal, no suicidal or homicidal ideations, and no
> paranoia or other delusions (Exhibit 19F/p. 88; 27F/p. 16). He manages
> his own personal care, cooks, cleans, does laundry, watches television,
> reads, listens to music, and uses social media (Exhibits 4E, 33F, 34F,
> and Hearing Testimony). The record supports he could perform
> unskilled work as outlined in [the] RFC ….

(Tr. 155).

        Having arrived at this RFC assessment, the ALJ found that if Adams stopped
the substance use, given his age, education, work experience, and residual functional

capacity, there were jobs that exist in significant numbers in the national economy that he could perform. (Tr. 156). Accordingly, the ALJ concluded that:

> [Adams'] substance use disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if he stopped the substance use (20 CFR 404.1520(g), 404.1535, 416.920(g) and 416.935). Because the substance use disorder is a contributing factor material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

(Id.) Based upon these findings the ALJ determined that Adams did not meet the stringent standard for disability set by the Act and denied this claim. (Tr. 157).

This appeal followed. (Doc. 1). On appeal, Adams advances a single argument, contending that the ALJ erred in concluding that his drug addiction was a contributing factor material to the determination of disability because he would not be disabled if he stopped the illicit substance use. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III. **Discussion**

### A. **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the

record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency

13

factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid</u>.; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek</u>, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See <u>Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal

matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

15

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process,

the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical

opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other

evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

19

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 433 (3d Cir. 1999).

### C.   Drug Addiction and Disability: The Analytical Paradigm

Additional considerations apply in a case such as this where the claimant's active drug use must be taken into account. Our analysis of Adams' Social Security appeal begins with a clear Congressional mandate. In 1996, Congress amended the Social Security Act to speak directly to the issue of drug dependence as a contributing factor in disability claims, stating that: "An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423 (d)(2)(C).

Pursuant to this Congressional directive, the Commissioner has, by regulation, created an analytical model for evaluating the role of drug addiction as a contributing factor in disability cases. These regulations provide as follows:

(a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.

(1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

21

(2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

(i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 C.F.R. § 404.1535.

One court has aptly described this analysis in the following terms:

In cases involving individuals suffering from drug or alcohol addiction, "(a]n individual shall not be considered to be disabled ... if alcoholism or drug addiction would ... be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C), 1382c(a)(3)(J); see also 20 C.F.R. §§ 404.1535, 416.935.

In determining whether drug addiction or alcoholism is a material contributing factor to an individual's disability, the "key factor" is "whether [the ALJ] would still find [the claimant] disabled if [he or she] stopped using drugs or alcohol." 20 C.F.R. § 404.1535(b)(1). To make this determination, the ALJ must evaluate which of the claimant's physical and mental limitations would remain if the claimant stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b)(2). The ALJ must then determine whether any or all of the claimant's remaining limitations would be disabling. Id.

If the ALJ finds that the claimant's remaining limitations would not be disabling, the ALJ "will find that [the claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(b)(2)(i).

If, however, the ALJ finds that the claimant's remaining limitations are disabling, the claimant is "disabled independent of [his or her] drug addiction or alcoholism" and the ALJ "will find that [the claimant's] drug addiction or alcoholism is not a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(b)(2)(ii).

Social Security Ruling (SSR) 13–2p establishes the procedure used by ALJs when evaluating drug addiction or alcoholism materiality. SSR 13–2p, 78 Fed. Reg. 11939–47 (Feb. 20, 2013). First, the ALJ will "apply the sequential evaluation process to show how the claimant is disabled." Id. at 11942. Next, the ALJ will "apply the sequential evaluation process a second time to document [drug addiction and alcoholism] materiality ...." Ibid.

Bowers v. Comm'r of Soc. Sec., No. CV 16-6589 (KM), 2017 WL 4711470, at *2–

3 (D.N.J. Oct. 20, 2017).

Put another way:

If the ALJ finds that the claimant is disabled, but there is medical evidence that the claimant suffers from drug addiction or alcoholism, the ALJ must then determine whether the addiction or alcoholism "would ... be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). The "key factor" is "whether we would still find [the claimant] disabled if [he] stopped using drugs or alcohol." 20 C.F.R. § 404.1535(b)(1). In making this determination, the ALJ must evaluate which of the claimant's physical and mental limitations would remain if the claimant stopped using drugs or alcohol, and whether any of those limitations would be disabling. Id. § 404.1535(b)(2). If the ALJ determines that the remaining limitations would not be disabling, the ALJ must find that the claimant's drug addiction or alcoholism is a

contributing factor material to the determination of disability. Id. § 404.1535(b)(2)(i). If the ALJ determines that the remaining limitations *are* disabling, the ALJ must conclude that the claimant is "disabled independent of [his] drug addiction or alcoholism and ... [his] drug addiction or alcoholism is not a contributing factor material to the determination of disability." Id. § 404.1535(b)(2)(ii).

Martin v. Comm'r of Soc. Sec., 547 F. App'x 153, 156 (3d Cir. 2013).

Further, when ascertaining whether "an individual's substance abuse problems were a factor material to the disability determination that '[t]he most useful evidence ... is that relating to a period when the individual was not using drugs/alcohol.'"

Mirabile v. Comm'r of Soc. Sec., 354 F. App'x 619, 622 (3d Cir. 2009). Therefore, assessment of the severity of the claimant's impairments during periods of sobriety is often crucial to the evaluation of the role of addiction in disability determinations.

## D. **The ALJ's Decision is Supported by Substantial Evidence.**

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial

24

evidence supported the decision by the ALJ that Adams' drug addiction was a material contributing factor in his alleged disability and Adams would not have been totally disabled in the absence of his addictions.[2] Therefore, we will affirm this decision.

The evidence relied upon by the ALJ to support this conclusion was substantial and came from a variety of independent sources. First, Adams' self-reported activities of daily living—which included occasional agricultural work, his own personal care, cooking, cleaning, doing laundry, watching television, reading, listening to music, and using social media—strongly suggested that Adams was capable of performing a limited range of sedentary work when he abstained from drug use.

The ALJ also held that Adams' clinical history drew a direct correlation between his active drug abuse and the severity of his impairments, further suggesting that these conditions were not disabling in the absence of Adams' drug abuse. In this

---

[2] In reaching this conclusion we note that there is some debate regarding who bears the burden of proof on this issue. However, like the court of appeals  in McGill "[w]e need not decide this issue," in the instant case because even if we placed the specific burden of showing the materiality of drug addiction upon the Commissioner under the deferential which generally guides our evaluation of these cases Adams' claims fail since substantial evidence supports a finding that the plaintiff's addiction materially contributed to his alleged disability. McGill v. Comm'r of Soc. Sec., 288 F. App'x 50, 52 (3d Cir. 2008)

regard, the ALJ aptly noted that "there are not many prolonged periods of sobriety, and the record shows the claimant is often non-compliant with treatment, including sobriety, medication non-compliance, and no shows at appointments." (Tr. 152). Nonetheless examination results, and particularly those examination results which recorded clinical encounters shortly after Adams' release from custody and forced sobriety, did not reveal a completely disabling degree of impairment. Therefore, the limited medical evidence that existed assessing Adams when he was sober undermined his claim that, even in the absence of his drug abuse, his impairments were entirely disabling.

Finally, given this medical evidence, the ALJ correctly concluded that the medical opinions which found that Adams could perform some work had greater persuasive power since these medical opinions were consistent with and supported by the clinical record and Adams' activities of daily living. While, on appeal, Adams argues that the ALJ's failure to directly address Dr. Klebe's treating source opinion compels a remand, we disagree. To be sure, the ALJ should have expressly evaluated this opinion, however we find that any error in the ALJ's failure to specifically address Dr. Klebe's one-page report issued in December of 2013 is harmless on the facts of this case.

It is well-settled that Social Security appeals are subject to harmless error

26

analysis. Therefore:

> [A]ny evaluation of an administrative agency disability determination must also take into account the fundamental principle that: "'No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.'" Moua v. Colvin, 541 Fed.Appx. 794, 798 (10th Cir. 2013) quoting Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989). Thus, ALJ determinations in Social Security appeals are subject to harmless error analysis, Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009) and "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409, 129 S. Ct. 1696, 1706, 173 L.Ed. 2d 532 (2009).

Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *4 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017). In this regard "we apply harmless error analysis cautiously in the administrative review setting." Fischer–Ross v. Barnhart, 431 F.3d 729, 733 (10th Cir. 2005). However:

> In Social Security appeals courts may apply harmless error analysis when assessing the sufficiency of an ALJ's decision. Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009). "Under the harmless error rule, an error warrants remand if it prejudices a party's 'substantial rights.' An error implicates substantial rights if it likely affects the outcome of the proceeding, or likely affects the 'perceived fairness, integrity, or public reputation of judicial proceedings.'" Hyer v. Colvin, 72 F. Supp. 3d 479, 494 (D. Del. 2014).

Harrison v. Berryhill, No. 3:17-CV-618, 2018 WL 2051691, at *5 (M.D. Pa. Apr. 17, 2018), report and recommendation adopted, No. 3:17-CV-0618, 2018 WL 2049924 (M.D. Pa. May 2, 2018).

The harmless error doctrine applies here since the ALJ's failure to directly address Dr. Klebe's opinion does not affect the outcome of the proceeding, or likely affect the perceived fairness, integrity, or public reputation of these proceedings. Quite the contrary, this error is harmless because any fair reading of Dr. Klebe's report indicates that the doctor believed that Adams' disabling impairments were directly and inextricably connected to his persistent, profound polysubstance drug abuse. Thus, fairly construed, Dr. Klebe's one-page report seemed to support, rather than refute, the ALJ's conclusion that Adams would not be completely disabled if he refrained from drug use. Thus, the failure to specifically analyze this opinion which further bolstered the ALJ's decision is at most harmless error.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this

court acting *de novo* might have reached a different conclusion.'" <u>Monsour Med.</u> <u>Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas,</u> <u>Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   **Conclusion**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: November 30, 2023